CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, Marcel Behnen, being duly sworn, depose and state that:

## Introduction

1. I am a Task Force Officer with the United States Drug Enforcement Administration, United States Department of Justice, and have been so since March 2019. I have been a police officer with the Kalamazoo Department of Public Safety for about 12 years, the last 4 of which I have been assigned as an investigator with the Kalamazoo Valley Enforcement Team (KVET), which is tasked with investigating narcotics trafficking. I am currently assigned to the Grand Rapids District Office in the DEA's Detroit Field Division. During my time as a KVET Investigator, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire and electronic communications. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. §

841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C.§ 1957.

    2.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the following electronic devices and their contents:

    a.    **Subject Device 1**: Black Apple iPhone 7, Model A1660, unknown IMEI, with cracked front screen; and

    b.    **Subject Device 2**: White/Silver Apple iPhone 11, unknown model/IMEI, cracked front and rear,

(hereinafter the "**Subject Devices**"). These items were seized from Jhontae JAMISON on January 28, 2021. These items are currently in the custody of the Kalamazoo Valley Enforcement Team (KVET) in Kalamazoo, MI.

    3.    The applied-for warrant would authorize the forensic examination of the **Subject Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

    4.    I respectfully submit that there is probable cause to believe that Jhontae JAMISON has engaged in the possession with intent to distribute cocaine base (crack cocaine), in violation of 21 U.S.C § 841(a)(1) and (b)(1)(C), and possessing a firearm after having been convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). I further submit that there is probable cause to believe that evidence of these

offenses will be found on the **Subject Devices**.

5. The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This continuation is intended to show merely that there is sufficient probable cause for the requested search of the **Subject Devices** and does not set forth all of my knowledge about this matter.

## Probable Cause

6. On December 15, 2020, KVET Investigator Scott Bogard spoke with a KVET confidential source (the KVET CS[1]), who advised s/he was able to purchase crack cocaine from a subject utilizing phone number 269-598-9367. The informant added that they have bought crack cocaine on several occasions from that subject by ordering from that phone number.

7. Investigator Bogard searched the phone number in the Kalamazoo County Jail Telmate inmate calling website/portal and found the phone number 269-598-9367 to be communicating with inmate Marc Ross in December 2020. Investigator Bogard recognized the voice as that of JAMISON based on comparison to Facebook videos that JAMISON had posted in the past. The context of one of the conversations also mentioned a "mustard" colored hoodie/sweatshirt of Ross being

---

[1] Investigators believe that the KVET CS is a reliable source of information because the CS has conducted over 15 successful controlled buys under the direction of KVET and provided KVET with accurate information that has led to the seizure of narcotics. The KVET CS's criminal history shows convictions for possession of marijuana, operating under the influence, burglary of a motor vehicle, assault and battery, and six retail fraud convictions. The KVET CS is cooperating with law enforcement for monetary gain.

3

worn by the Telmate user of 269-598-9367 and posted to Facebook. Investigator Bogard was able to find this photograph and recognized it to be JAMISON wearing the "mustard" yellow sweatshirt. Investigator Bogard then showed the KVET CS a photograph of Jhontae JAMISON whom s/he positively identified as the person they had ordered and purchased crack cocaine from at phone number 269-598-9367.

8. On December 16, 2020, KVET investigators arranged for the purchase of $40.00 worth of crack cocaine from JAMISON utilizing the KVET CS. The KVET CS called 269-598-9367 to arrange the purchase from JAMISON. Investigators surveilled the KVET CS to a predetermined location where s/he made contact with JAMISON, who was driving a red Chrysler 300 sedan. At the conclusion of the controlled buy, the KVET CS met with KVET investigators and turned over a sandwich bag with .32 grams of chunk material. The Kalamazoo Department of Public Safety (KDPS) Crime Lab tested the material and found it contained cocaine.

9. On January 28, 2021, KVET investigators again arranged for the purchase of $80.00 worth of crack cocaine from JAMISON. The KVET CS called 269-598-9367 to arrange the purchase from JAMISON. Investigators surveilled the KVET CS to a predetermined location where s/he made contact with JAMISON, who again was driving a red Chrysler 300 sedan. At the conclusion of the controlled buy, the KVET CS met with KVET investigators and turned over a paper fold with .59 grams of chunk material; the KDPS Crime Lab tested it and found it contained cocaine.

10. On January 28, 2021, a Kalamazoo County District Court Judge issued

a search warrant for JAMISON's residence, 1005 Russell St, Kalamazoo, Michigan, and JAMISON's red Chrysler 300, Michigan registration EJR7727, to look for evidence of ongoing violations of controlled substance laws.

11. On January 28, 2021, prior to the execution of the search warrant, investigators located JAMISON's car at 5423 Meredith, Apt 1A, Portage, MI. JAMISON eventually exited the apartment and returned to his red Chrysler 300. KVET investigators attempted to contact JAMISON to search the vehicle and question JAMISON about driving with a suspended license. JAMISON disobeyed officers' commands and eventually fled the location in his car, striking the apartment building with his car in the process.

12. Using a GPS unit affixed to his car[2], KVET investigators tracked the car to a parking lot at 3600 Alvan Rd, Kalamazoo, MI. Upon arrival in the parking lot, Investigator Matt Slenk observed JAMISON in the parking lot. JAMISON ran upon seeing the unmarked KVET vehicle and scaled a large metal fence (which was topped with barbed wire and electrified) and fell to the ground on the other side and continued running in a northwest direction.

13. With the assistance of Kalamazoo Department of Public Safety and Kalamazoo Sheriff's Department patrol units, a perimeter was established. Investigators observed a blue Ford Fusion pull into 3330 Miller Rd, turn around, and attempt to exit a short time later. Investigators knew that JAMISON has a child

---

[2] On December 17, 2020, KVET investigators had obtained a search warrant from a local judge to install and monitor a GPS tracking device on JAMISON's car for a period of 45 days.

in common with Ashley Shelby, who drives a blue Ford Fusion. Investigators contacted the occupants of the blue Ford and JAMISON was in the front passenger seat. Investigators arrested JAMISON.

14. JAMISON was searched incident to arrest, and Lieutenant Eric Reiber and Investigator Greg Day located a knotted plastic baggie containing crack cocaine on his person. The Kalamazoo Department of Public Safety crime lab later tested and weighed it; it was 15.36 grams of cocaine base. Additionally, two cell phones (the **Subject Devices**), a digital scale, and small quantity of U.S. currency were located on his person.

15. KVET investigators subsequently executed the search warrant at JAMISON's residence, 1005 Russell Street, Kalamazoo, MI. While searching the northwest bedroom, I seized an empty black Walther PPQ 9mm handgun magazine from the bedroom. In the same bedroom I located several documents for Jhontae JAMISON and clothing he had been observed wearing earlier in the day.

16. At the same time of the search warrant of the residence, investigators were conducting an article search with a police canine along JAMISON's flight path, between where his vehicle was parked and where he was arrested. A few yards from where JAMISON landed after jumping the fence, investigators located a Walther PPQ 9mm handgun, serial number FCT3765. Investigator Khillah found the handgun to be laying on top of the snow which had fallen a few days prior. Due to the cold temperatures, moss and grass had also began to re-freeze to the warm handgun. The handgun also did not appear to have any rust or damage to indicate

it had been exposed to the elements for a very long time.

17. In JAMISON's Chrysler 300, investigators found packaging material for drug sales, namely pre-torn lottery tickets, in the car's center console.

18. On January 29, 2021, KVET Investigator Bogard interviewed JAMISON at the Kalamazoo County Jail. JAMISON waived his *Miranda* rights and agreed to speak. JAMISON made admissions to selling "syrup" and selling crack cocaine "every now and then." JAMISON admitted to knowing he could not legally possess a firearm "because I'm a felon." JAMISON was asked about his phone and denied there would be "drug talk" on the phone, but did say there would be pictures of old guns from the past summer (he did not specify on which phone those images would be found).

19. On January 29, 2021, United States Magistrate Judge Phillip Green issued a federal criminal complaint/arrest warrant against JAMISON for being a felon in possession of a firearm, possession with intent to distribute cocaine base, and possession of a firearm in the furtherance of a drug trafficking crime. (1:21-mj-52-PJG).

20. Additionally, on July 31, 2020, JAMISON was the victim of a shooting. During the subsequent investigation, KDPS detectives seized JAMISON's cell phone and obtained a search warrant to search the device from a Kalamazoo County Magistrate Judge. A detective reviewed the device extraction and found it to have several photographs of JAMISON posing with large sums of U.S Currency and firearms.

21. Based on my training and experience, I know that drug traffickers frequently use more than one cell phone to conduct their drug trafficking business. For example, I have encountered drug dealers that use one cell phone/phone number to communicate with their suppliers, and a separate cell phone/phone number to communicate with their customers. I have also encountered drug dealers who use one cell phone/phone number for certain customers and co-conspirators with whom they have long-standing relationships that the drug dealers believe are more trustworthy, and a separate cell phone/phone number to communicate with lesser known and lesser trusted customers.

22. Further, based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

    a. Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices.

    b. Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices.

    b. Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices.

8

d.  Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking.

e.  It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds.  This evidence includes currency, financial instruments, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, and records concerning storage lockers.  These and other items are maintained by the drug traffickers within their residences or other locations over which they maintain dominion and control.

f.  That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities.  To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

g.  User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation; and

h.  Drug traffickers often use the internet to look up various

information to support their drug trafficking activities.

## Technical Terms

23.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.      Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.      Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded

10

images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

        c.     Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

        d.     GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits

by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

    e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

    f.  IP Address: An internet protocol address (or simply "IP address") is a unique numeric address used by computers on the internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the internet must be assigned an IP

address so that internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

24. Based on my training, experience, and research, and from consulting the manufacturer's advertisements and product technical specifications available online, I know that the **Subject Devices** have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and/or PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### Electronic Storage and Forensic Analysis

25. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

26. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Devices** were used, the purpose

of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the **Subject Devices** because:

      a.    Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

      b.    Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

      c.    A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

      d.    The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

27. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

28. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

29. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Subject Devices** described in Attachment A to seek the items described in Attachment B.